Case number 20-5382, Merck Works, et al., Italy, v. United States, Department of the Interior, et al. Mr. Flynn for the Italy, Mr. Toedt for the Italy, Ms. Dawson for the Intravenous. Council, I do not, should I be seeing a council at this point? There we are, okay. Good morning, Council. We apologize for the remote arrangements, but thank you for your flexibility in making this work. Mr. Flynn, whenever you're ready. Good morning, Your Honors. May it please the Court, I'm Roger Flynn, a counsel for Appellants Earthworks. The Court's Commission would like to reserve about five minutes or so for rebuttal. Just at the outset, I'd like to thank the clerk's office for arranging this on the fly in the snowstorm from our hotel room here in Washington. So I really appreciate their awesome work this morning. I would first like to discuss how we got here and the fundamental issue of how the Interior Department complete reversal of its existing mill site policy, which existed for years when it issued the 2003 rule, was not a logical outgrowth of the 1999 proposed rule when that proposed rule did not mention at all the remote possibility that the agency would overturn its existing policy set by the Secretary of Interior. That policy in 1997 and in the 1999 proposed rule was binding, immediately binding, on all agency offices in the field. Congress stayed that essentially for two years out of fairness, and they said it couldn't be applied for mining plans that were in the works at the time. They did not overrule it, they did not abrogate it, and they left it in place for the next three or four years. We're talking about a distinct interpretive question, pretty straightforward, about the meaning of the words on the page of 30 U.S.C. 42, which either requires a one-to-one correspondence of mill sites to mines or requires a five-acre total or doesn't require either. And that's what the dispute is about. Different people took different positions. I mean, do you think it wasn't foreseeable that they would take position one way or the other on that seemingly unitary question? Well, I think the case law that we cited from this circuit talks about when the agency, the public, not the representatives represented by counsel, but the public has to have an idea that the agency was about to reverse itself and give an opportunity to comment upon that potential reversal. In 1999- That's what happened. I mean, they put out the original proposal, they took public comment. Apparently, the comments opposing the proposal were persuasive, and so they withdrew the proposal. Well, if the public had been given the opportunity to comment upon a potential reversal, we would have done so. But you mean reversal? You mean decision not to go forward with the proposal? Well, the proposal in 1999 was just to codify the existing policy set by the Secretary in 1997. That was the policy. The agency argues on standing on the APA and on NEPA that all they did in 2003 was go back to the status quo. Pre-1997, the status quo- Isn't that always an option? Isn't that always an option? You've got a rulemaking, they put out the proposal, and they decide not to do it. That's the logical outcome. Well, you know, interestingly, the rule that was there prior to 1997 in the regulations in the CFR, it was at that time called 43 CFR 3844. That had nothing about limits on mill size, either pro or con, so there was no inclination. Essentially, as we pointed out in the case law, the public shouldn't have to divine the Secretary's thinking that it would come up with a proposal that was exactly opposite of what was on the books. The general counsel gave an opinion in 97, right? And then the Secretary proposed to adopt that through CFR and then decided not to do so. Why is the general counsel's opinion any more binding than, well, why is it binding at all? It was, Your Honor, it was not just the solicitor of the Interior Department, the general counsel, but that at the bottom of it, it was signed, co-signed, so to speak, by the Secretary of Interior, Secretary Babbitt. So when the Secretary signs that, it becomes a directive on the entire Interior Department. No agency could, no agency office in the field could violate that. All right, so did, what do we have by way of instances, I don't think you showed us any, in which the Department, acting on that interpretation in the co-signed opinion letter, denied applications? The district court made a big point about that, but what was happening is for the first two years, 97 to 99, roughly, Congress stepped in and said, well, you can't apply that. Then there was a gap period. There was no appropriation bar. Right, there was about four years or so there, three or four years. Any examples there of applying the policy? Well, no, because the mining industry knew that it would be illegal. So the mining industry didn't apply for excess mill sites or patents. There was a moratorium, but many were grandfathered in. You know, so if the speed limit is 55 and no one goes over 55, that doesn't mean there's not a speed limit. So the industry knew that anything they submitted within those three or four years would be illegal, would be instantly denied by the Interior Department. So the fact that no mines were denied or limited based on the 97th secretarial opinion doesn't mean that it didn't exist. It was binding. What was it? Excuse me, D.J.? How many applications have been received since, well, to date? Well, how many mining projects have been submitted since 2003? Hundreds or dozens, basically. But in that gap, I think you were focusing on, Judge Ginsburg, that three or four year gap. There were none because no mining company would submit something knowing they would be denied by the Interior Department. I got you right. You just said that once the department switched its position, they did receive a raft of applications for additional locations. Is that correct? Yeah, that's what's going on right now. We pointed out one mine in Arizona submitted hundreds of mill site claims. That's what they're doing out in the field based on the 03. But when the 03 rule came in, we had no idea they were about to switch positions. Can I ask you a question? Yes. The 2003 rule says, this is at JA 817, during fiscal year 2002, claimants recorded 15,407 new mining claims and sites. So how is that consistent with there were none? Oh, you can file mining claims. I thought the question from Judge Ginsburg was, did anyone propose mining operations on those claims? Without asking for mill sites. There are 15,000 sites with no mill sites. That's my understanding. They didn't provide the list of those claims. But since 2003, they've been approving operations with additional mill sites. But during that window of three or four years, Congress stated for a couple of years, there was none as far as I know. And so that's the issue. The question is, in 03, what was the status quo? So they're saying we didn't have to really do look at any environmental impacts. We didn't have to notify the public because all we were doing was going back to the status quo. But the status quo was the secretarial directive from 97. And so that's all we had to go on. We didn't know if the agency was on the first thing. We didn't want the secretarial directive was not the product of any rulemaking. No, secretarial directors are not rulemaking. They're binding upon agency out in the field. And as what happened here, direction to the field offices, as it were. Yes, sir. And then in 99, they proposed to with slight modifications, codify that in the regulation. And but there was no indication, nothing in the in the regulatory, the preamble or the notice or anything saying, please comment on us reversing this. Why would the secretary's office in 1999 propose or even let the public think that it was going to reverse itself? It only reversed itself when the new administration came in and no one and then only after two more years. And so there's this black hole for four years. We didn't know anything. We had no idea to comment. They did that environmental assessment. There was no public notice. We didn't even know they were doing it. They don't do anything. Could the secretary have just reversed that directive? The new secretary and you would have had no notice and comment either. I'm saying putting aside the rulemaking, they had a policy on the books that was signed by Bruce Babbitt, the former secretary. Couldn't the new secretary just reverse that sign a new directive? That's not a policy anymore. And you would have had no notice and comment on that. Well, that's what happened in the way the timeline worked in October of 03. The solicitor and the secretary, the new secretary, Gail Norton, issued the 03 opinion and then which reversed the 97 opinion from the secretary. And then a few days later, the environmental assessment came out again. You know, they were working on it, which you normally have to let the public at least comment sometimes. And then about 10 days, two weeks later, outcomes, the 03 rule, which completely reversed everything. It was one, two, three out of the blue. We had no idea. So the so the actual sequence of events might come close to Judge Pan's hypothetical question. But what's the answer to that? So Secretary Norton writes and writes a memo saying we're going back to the pre 97 understanding. Or, you know, I know that might be tested. The understanding that. Met the many, many people who were complaining about the 97 order were advocating for. Right. Which is no one to one and no five acre aggregate limit. Right. What happened was the debate for years. Right. But under the APA process, it's not just counsel for the industry or counsel for earthworks and the other conservation groups. There has to be public notice. Not not not for an interpretive rule. There wasn't an opinion. Right. No, exactly. We're talking about the rulemaking, you know, three, the final rule. That is what was not a logical outgrowth to the proposed rule. And so what we ask on remand and I see I'm cutting into my rebuttal time. But on remand that they do a rulemaking and have public notice and actually look at the environmental impact of reversing its position, which there is. They didn't do any environmental review. Zero. So I have about three more minutes. I'd say for rebuttal. You want to you want to get to the merits a little bit. Frankly, I'm more interested in that. Right. OK. Yes, Your Honor. Section. Basically, the agency is manufacturing an ambiguity here about how many mill sites you get. The plain language is very clear. Mill sites are tied to the development of the load claim. And, you know, if even if you can think that there was an ambiguity under Chevron step to the industry. I mean, agencies always want to go to Chevron step to saying there's an ambiguity. But as we pointed out under public land law since the 1800s, the Supreme Court time and time again. If there is an ambiguity and let's just assume there is, we know the commentary for 100 years, including that to Congress said there is no ambiguity. You're limited on mill sites. But even if there is an ambiguity. That is ruled in favor of presumed interpreted in favor of the government and limiting the grant. What's your best argument for why your reading is unambiguous? Because I can see that you have a strong reading of this statute. But what's your best argument for why unambiguously correct? Well, we look, I mean, history matters in this case. And we look at the original language and what was going on in 1872. The opinion talks about modern mining. We need more acres. Yes. The mining industry needs thousands of acres of mill site claims. But in 1872, they didn't. If you look at all the analysis from the Interior Department, early decisions through the commentary into the 1960s and 70s, everybody knew that back in 1872, you didn't need much land. There wasn't big waste dumps. There wasn't big processing. You only the 20 acres for the mining claim. And then for each 20 acres, you got five acres of mill site. That was more than enough. Congress did not contemplate at all that they needed all these acres. So what if we agree with you? Maybe the 1872 Congress intended it to work that way. But what they wrote in the statute doesn't unambiguously say that. I think the only way you win is if your reading is unambiguously correct. Right. And that's what I think. Then you go, as all the briefs said, you go to the tools of statute, standard tools of statutory construction. And in all those railroad cases and into the 20th century, the statutory tool of construction was any ambiguities when you grant, when the feds are granting away public resources to private entities, mining companies, railroad companies, any ambiguity, even if there is one, is resolved in favor of limiting the grant. And the district court didn't talk about that. It's never in the 97 opinion mentioned that. Nobody else does. Everyone just seems to have forgotten that that is a primary tool of statutory construction when you have ambiguity. And so even if you get to step on step two, you really don't. It's under step one. Judge Cassis, I think your recent decision in the employer's case basically said you look to statutory tools to determine ambiguity. And in that case, you limit the grant. Not expand the grant. And that's the problem here is your preferred position. Want one mill site or mining site or total of five acres per one mining site? I think the 1999 proposed rule clarified a little the 97 opinion and said because mining companies always want to maximize their mining claims to go up to the full 20 acres. And therefore, you got five acres for the 20. Now, they argue that, well, the courts have allowed people to file multiple mining claims. That's fine. We agree with that. So every time you file a new mining claim, another 20 acres, you get another five. You get three 20 acres, you get 15 acres. And that's the way it was set up back in 1872. And that was the rule for decades. So what sense does your rule make if the related rules and practices are that the mining company can file, can make as many claims and seek as many patents as it wants and it can subdivide those claims as much as it wants? Oh, yeah, that's the I'm sorry. No, I mean, I just, you know, if if the number and configuration of the mining claims is unlimited, just seems like what are we fighting over here? Well, that's the the minuscule mine claim theory, which the district court rejected as as unpersuasive. And so essentially, mining companies always want to maximize their claim. The 1872, you couldn't file a claim of a few feet that you would have been laughed out of the saloon that night. So everyone wanted to maximize their claim in 18, from 1866 to 1872, they actually expanded, they increased the amount of land you could follow along the vein or load of all underground mining at that time. And so you would follow along the vein or load up to 28, 1500 feet by 600 feet. And then you can go if you found more. Okay, I'll file another claim and get more. Sure, but, but if the, you know, they're mining the, I'm sorry for the mixed metaphor, if they're going after the low hanging fruit at that time, and no one needs the 5 acre limit is not really a constraint. But that practice doesn't really tell us one way or the other, whether they can, what happens if they need more area for the millstone. Right, right. I think one of the issues that I think it was in the briefing in both opinions actually recognize that this is not the end of the world for the mining industry that it's going to shut down open pit mining or anything. And I've been personally involved in cases where you do a land exchange. So let's say you get 100 acres for mill sites, but you need 1000. Oh, the mine is dead. No, for that extra 900, mining companies do land exchange, they can do sales. Congress has stepped in and ordered land exchanges. And so there are many ways for mining companies to operate profitably in the West. The key is, they wouldn't have a statutory right, because when you have a statutory right to dump thousands of acres of mine waste, that cuts out all the other public uses. It eliminates the federal discretion. So all we're really asking for when you take all the legalese out of this is that under the law, there are competing uses on public land. And so the statutory rights of the mining law are limited. You get some, but you don't get this essentially thousands of acres. And therefore, the Interior and the Forest Service agencies can then have the discretion whether to allow the extra waste dump. But not as a statutory right. That's the issue. It's the property right under the Fifth Amendment that the industry wants here. If the mining law doesn't give it to them, and they should be, the agency's discretion for these extra thousands of acres, we think, has been stripped away by the 03 rule. That's the problem. It's stripped it away with no public notice and no environmental review when you boil it all down. I think your strongest argument here that is structurally your reading is the one that makes the most sense, or maybe the only one that makes sense, because I think everybody agrees that the mill sites are linked to a mining claim. And the mining claim is limited in size. The mining claim is either 1,500 by 600 feet for a load claim, or it's 20 acres for a placer claim. And so structurally, I think your argument would be, it cannot be that they limited the mining claim, but said the mill site that's attached to it can be infinity, as long as it's used for mining and mill site purposes. The size of the mining claim is limited. This provision limits the size of the mill site to five acres. And if you read it the other way, that means land use for mill sites up to infinity, as long as it's used for mining and mill site purposes. And structurally, that's not the way you can read this statute? That's right. That's right. I mean, basically, as long as you reasonably relate it to mining, that's the phrase you can have. I mean, out in the West, we have mill sites covering thousands and thousands of acres, double, triple, quadruple the lands in the mine pit. That's not how the mining well was set up. The actual, and this showed up in the 1969-70 congressional report, the 1979 congressional report. They all said, you got 20 acres for the mine claim, and you have more, you can get more, and you get five acres for mill sites, 20 to five, 40 to 10, 60 to 15, on and on. That's the way the well was set up. They weren't giving unlimited mill site acres in 1872. It didn't cross anyone's mind. You read all the professors, the Interior Department decisions, the industry themselves for decades said, we have a problem. We've got to go to Congress and change this. Congress, for whatever reason, did not change it, even though they were told they needed to change that. The bottom line is the agency did hear by regulation what Congress chose not to do, and that, I think we can all agree, is not what an agency can do. They do not have the power to remake the law unless Congress said they could, and that's a problem. Before the Leshey opinion, the department was operating on what you say is the Muskegon reading, and I think they were doing so for 50 years. Is that correct? Roughly since World War II, the BLM in its current form was constituted right after World War II, and so as the thing that happened after World War II, the mines got big. There's very few underground mines anymore. These mines are now covering 8,000, 10,000 acres, most of that being waste dumps and chemical processing. Yes, for those decades between World War II and the 90s, they were doing that, and then the Secretary of Interior in 1993 came in and said, wait a minute, this violates the mining law, so then they had their staff. They looked at it for a number of years, and then they came out and said in 97, all of that stuff was happening in Idaho and Nevada out in the field. We didn't approve that. That's not what's going on here, or it's legally going on. They did approve it. Out in the field. Yeah, so that was the practice for 50 years. That was the practice, and I think, Your Honor, that's their basic argument. Hey, we were doing this for 50 years. That makes it legal. I think the Supreme Court got it right a few years ago in the McGirt v. Oklahoma case, you know, the Cherokee rights there in Oklahoma, where they said, you know, the fact that the agency got it wrong in that case for over 100 years, the fact that they got it wrong here out in the field, that doesn't make it legal. I think we can all agree on that. It's the law that matters, the language and the history. Even if that's true, I think the issue here is about ambiguity, because if it's ambiguous, then we defer to the agency, and they've ruled a different way. And so you have to, I think, convince us that you are unambiguously correct. And even if you have the better reading of the law, why is it ambiguous? Because it doesn't say how many mill sites you're allowed to have. Right. Well, we know the Chevron Step 2 is up tomorrow at the Supreme Court, but under today's Chevron, still applies. And we say that, as I mentioned before, a traditional, all parties agree that when you interpret an ambiguity, is there an ambiguity here? You look to traditional tools, and those two traditional tools here is history, 1872 matters, not 1972, not 2003 or today. And any ambiguity on statutory construction, the Supreme Court has said time after time. Now there's, you know, the modern cases don't, this doesn't pop up too often, but that doesn't mean the Supreme Court was wrong in case after case. Ambiguities must be resolved in limiting the grant. And it says, one of the arguments on the other side is, well, Congress was silent on the number of, they didn't really mention this, on the number of mill sites you could get. You're saying that that canon of construction makes it unambiguous. Any ambiguity is done in favor of limiting the grant. So you put the tool of construction, that 1872 language, and congressional intent, and what was going on in the West at the time? But are you saying that it eliminates ambiguity? Like, say we think that under step one, it's ambiguous because it doesn't say the number of mill sites. You're saying the ambiguity is eliminated because there's a canon of construction that favors, I guess, land being assigned to the government and not to other parties? In a way, to determine whether it's ambiguity, there is an ambiguity. You go to what was, you know, you limit the grant. And it also, in those Supreme Court, mostly the old railroad cases when the railroads were fighting the government who got the grant, etc., you go to, it must be clear and concise language to create that ambiguity. I mean, limiting the grant must have clear and concise statutory language. There is none here that says you can have as much land as you want or as you need. And so the statutory construction tools, 1872, there's no way that mining companies were needing all this. And they have one example in a history book from Nevada, never looked at, no evidence, no details or anything. Everybody says you didn't need that, all that land in 1872. And so therefore, we don't think you get to Chevron step two. And even if you do, the ambiguity is resolved in favor of limiting the grant. They did the exact opposite. The 97 opinion recognized that. I mean, talking, there was the old Wilderness Society versus Morton case on the Alaska pipeline. The pipeline companies wanted an expanded grant. And the DC Circuit en banc said, we can't just give you more land because you need it. You've got to go back to Congress and do it. And that's what everyone said for decades. You want more land under Section 42, go to Congress. You can't do it by rule. And then comes Chevron in 1984, and there's no suggestion that it's somehow limited by this preexisting principle dealing with land grants. It sounds to me like the statutory norm we used to have, which is that statutes and derogation of the common law are to be construed narrowly. That was never expressly overruled. We just gravitated later to Chevron instead. Well, Chevron, we're talking Chevron step two here again. We think, look at 1872. It's clear that they didn't get all this land. And you didn't get it in 1872. But let's just talk about the ambiguity. We don't think that the presumption falls after, goes away after Chevron. There was actually a case, what was that, I think it was 2002, the Bedrock case, B-E-D-R-O-C case. It wasn't in the briefs, but I remember it where it was post-Chevron, and they said those presumptions didn't apply because it was clear that it was ambiguous. Here, it's certainly not clear that it's ambiguous. We think the statutory language is clear from Chevron step one. Agencies always want to have the case turned into step two and argue it's ambiguous, and then basically they get to determine the law, not your honors. But I think we all agree that, going back to Chief Justice Marshall, the courts say what the law is, and the law in 1872 was not this car launch, non-mineral land. I mean, as he pointed out, there's a lot of competition, fierce competition for non-mineral land. They wouldn't have just given it all to the mining company. There goes the ranchers, there goes the railroad, there goes the farms. Can you point me to the specific statutory text that you think at least ambiguously supports your position? Because your brief invokes the word such, and I just don't see that at all. Well, your honor, that's what the – there's the 97th opinion, and it ties every mill site claim to the mining of Vayner Loathe. Your best argument is the one Judge Pan articulated, which at most is a structural argument. To me, it feels a little bit more like – I don't want to sound pejorative. It sounds like a purpose sort of argument, a harmonization argument that you have to read into the statute a limitation that's not there, because if you don't, the five-acre limit just doesn't seem to make any sense. That's your position. Why did they put a limit on five acres? It's because there's other non-mineral land. There's other things going on. Mining law – One answer to that might be that when – there are independent requirements on the mill siting land. It has to be non-mineral. It has to be not contiguous. It has to be used to support the mining. They're just going to assess the fitness or the permissibility of the mill site site on a five-acre basis. That's the level of generality at which they're going to figure out whether the mill site land can be used for that purpose. That doesn't seem – if your argument is we have to read in a limitation to make other text not surplusage, it seems like that's enough to make the statute work. That's not a broken record, and I apologize. In 1872, that wasn't the case. The only other time this was discussed in the briefing that Congress ever looked at this was in 1960. The original 1872 language was just for load claims, the underground, the rock-in-places, they call it. Plaster mines are more the surface mines, the long streams and things like that. I'll slap you that, but it just feels a little bit like a classic question of Fourth Amendment and wiretaps. The framers never thought about wiretaps, but the best you can do is apply the words of the law to a new situation. The words of this law don't seem to foreclose multiple mill site claims. I see a textual reading of this, which was not raised in the briefs, that would support Earthworks' position. I don't know if this is unambiguous or not. The statute says, non-mineral land not contiguous to the vein or load is used or occupied for mining or milling purposes, such non-adjacent surface. If you accept to refer to all of the non-mineral land that's not contiguous and used for mining or milling purposes, such meaning all of it, then such land shall not exceed five acres. I do see a textual reading that would support your approach. It's not the one that you raised, but that's one way. If you were to read such as referring to all of the non-mineral land that's not contiguous that we're going to use for mining or milling purposes, all the mill site land, then that mill site land can't exceed five acres, there would be a textual basis for what you're saying. I don't know if that's unambiguous, because you can also read it as, this doesn't say you can't have more than one mill site. But I do see a textual argument in our favor. I would agree. I think it is tied to the such. In fact, in the government's answer brief they talked about, they admitted there was a link between mill sites and the mining of the vein or load. But then they pointed out that there was this other provision for an independent mill site that somehow proves their point, but that never came up in the order, never came up in the district court, never came up in the briefing until you showed up. And actually the 2003 opinion said that you only got one independent mill site. The language in the opinion at page 31 says that in the 1891 HECLA consolidated mine decision, it said, quote, the owner of a quartz mill or reduction works, those are the independent mill sites, they locate only one five acre independent mill site under the mill site provision. They only got one. I think we're just trying to zero in on the statutory language. Okay. Right. That's the thing that textually, like, what is the support for your argument? That's what we're trying to zero in on right now. Right. Because I read the such as just shorthand for you're talking about land out there. It's just right, whatever the land is, before we talk about subdividing it or not. It has to be non-mineral, it has to be not contiguous, and it has to be used or occupied by the proprietor for milling or mining purposes, not contiguous to that. That's the land we're talking about. It's introduced in a long introductory clause that runs, I don't know, 30 words or something. And then the such is just shorthand for all the land that meets all those descriptors. The land that meets all those, right? That's correct. I think Judge Fan, that's where you were going. The possible distinction is reading such as any non-mineral land that's non-contiguous and used for mining purposes for all of the non-mineral land that is used or occupied. Because if you say any, then that would allow multiple mill sites, correct? But if you say all of the non-mineral lands that's used or occupied for whatever, non-contiguous and used or occupied for non-milling, and that such land has to be five acres, then that would limit all of it to five acres. So I think there could be ambiguity in such, because even if you rely on such, such could mean any such land or all of such land. Well, you know, one of the, oh, sorry, go ahead, Judge Ginsburg. I guess, I mean, I could not frankly make sense of the argument in the way that Judge Fan has done, although I see her point. But when we go on to say, but no location, such non-adjacent land shall exceed five acres, introducing the term location here, which I understand from your brief is essentially a synonym of stake. Claiming, faking your claim, yes. That there's no limit on locations. Oh, well, this came up, it came up a lot in the briefing because you could have, those early cases said you got five acres maximum of mill site land to support the mining of the vein or load. In fact, a very narrow reading is that you only got five acres total. We're trying to limit this inquiry to the statute itself in order to see whether we can find your argument in the statute. Okay, so don't tell me about history the minute I mentioned the statute. Okay, fair enough, Judge Ginsburg. So, a lot of the briefing talked about you could have multiple mill sites to support every load, but the total had to be five. So, you could have one two-acre mill site, yeah, five acres. One two-acre and one three-acre. Well, how would that happen? Why wouldn't you put them in five? You might have to split them up. On the location clause, wouldn't the argument be that you're saying no location of such adjacent land? So, if such is read as any, then it would allow multiple mill sites, but if such is read as the, all of it. So, location of all of the non-mineral land that you're using for a mill site is limited to five acres. So, I think that the ambiguity is in such, whether it's read as such equals any such land or the land, all of the land. And I think that location changes that ambiguity. Am I correct, Judge Pan, in saying that this is, the point you just made is one that was not the one made in the briefs? Correct. Not in the briefs. Not in the briefs. Right. Now, the brief is not a viable reading on behalf of the appellants here. Well, Your Honor, I would respectfully say that when we focused on such and we focused on the five acres total, you've got a total location or claiming of five acres. I think that gets to where you're going there, Judge Pan. You know, the early cases allowed you to file more than one mill site. It's just the total had to be five acres max for the mining of every ore body or vein or load, as it's called in the statute. And so, that was the limit there. And what language would they have used if the other side argued, well, they should have said, you only get one, period. Well, that wasn't what Congress was drafting. They basically said, you got five acres of location, which is the claim. One, two acre, one, three acre, it doesn't matter. It's five. And that's what the 97 opinion said. So, again, we don't think it's ambiguous. I mean, what was going on for 100 and some odd years? Everybody that looked at this, real environmentalists back then or environmental groups, industry lawyers, law professors, reports to Congress all said the interpretation that we're arguing. It wasn't until modern mining got real big and needed this, where the agency said, okay, well, we're just going to give them patents to all these lands. We're going to not pay attention to this. It doesn't make it legal. Yeah. I think the bottom line is, even if you have the best reading of the statute, I think you need to have an unambiguously correct reading of the statute. And I don't know if we're there. Well, respectfully, that would just ignore what the Supreme Court has been saying since the 1880s and 90s. Ambiguities must be interpreted to limit the grant. So even if we'll concede it, but for today, if there is some ambiguity, any ambiguity is interpreted to limit the grant. We just can't throw out that Supreme Court unbroken line of precedent. Case after case, you have to interpret the ambiguity. Again, so I don't know how they get around that. The Supreme Court has said when you're dealing with public resources, you err on the side of the public resource, not giving it away. And that's what the O3 rule does. It just gives away thousands of acres, a property right, a 50 minute property right. You raised that presumption argument in your reply brief, correct? We're responding to the Chevron argument. We raised it to the district court. District court didn't mention it. And so, as you know, the government in the industry argues that to Chevron, everything's ambiguous. That's what they argue all the time. And so we're saying that doesn't apply in this case. Things can be ambiguous, you know, maybe for the sake of argument. But when you actually interpret it, you interpret the such. If this was the case in 1890, which the same facts, the Supreme Court would say, oh, yeah, you don't get as much. The presumption is in favor of limiting the grant. And so they turn that on its head in 2003 and said, no, it's ambiguous. So we will give them thousands of acres, basically, for $5 an acre. The price hasn't changed. Even though the moratorium has to be renewed every year in Congress. So who knows what the next Congress will do with this? And so we think it's not ambiguous. The such ties to it. It's the total land. And I think we've made that point, particularly quoting the reports to Congress. The report to Congress, you probably saw that diagram that said the current law is you got one mill site for the big mine claim block. They said that's not going to work for the mining industry anymore. We've got it. And what was the solution? Go to Congress and get a big block of mill sites to go with your big block of mining claims with the ore body. That is going to help the mining industry. Congress, you should do that. But they didn't. And so it's not me. It's not even the 97th opinion from the secretary that says this. It was said for 100 years after the mining law. That's the way the law works. They're just ignoring that. And they say, well, that's just a report to Congress. There was no details. There was a lot of the articles written, a lot of the articles, Tweedy and Sweetwright report. They all said we've got to change the mining law because they don't get all this. We take your point about later sources. Judge Pan, any other questions? No, thank you. Judge Ginsburg? No, thank you. Okay. Thank you very much, Your Honor. We will give you rebuttal time. Thank you, sir. Okay. We'll hear from DOJ. Mr. Toth? May it please the court. Brian Toth from the Department of Justice representing the federal defendants at Belize. The regulation at issue in this case has been supported and defended in litigation by agencies under four different presidential administrations. As a threshold matter, I understand the court. I'm sorry. Are you saying that there's a legal challenge to your interpretation before? Is there a case that I'm not aware of? No. You've defended the court four times? No. This litigation has continued since 2009. Oh, you mean all of this litigation? Correct. This has not been a case that the government has compromised under any of those administrations settled despite the long-running status of the suit. So this is interesting to hear plaintiffs arguing about the lack of notice that they received over 20 years ago. Just on that preliminary issue, I would direct the court to the comments that they actually submitted on the proposed rule. They're in the joint appendix beginning at page 708. You'll see the issue is fairly joined here. They received sufficient notice. As a threshold matter, sort of backing up, I realize this is not anything the court asked my friend on the other side questions about. But as a threshold matter, the plaintiffs have failed to demonstrate that at the time of the suit and at the time of their summary judgment motions that they had Article III standing to bring their challenges against this regulation in the facial context. They do so here. The case that I would point the court to as instructive here is the Supreme Court's decision in the Summers v. Earth Island Institute case, also a facial challenge to regulations. And in that case, plaintiffs challenged the regulations, but they also challenged a site-specific project applying the regulations. The Supreme Court held that because the agencies had settled the site-specific challenge with the plaintiffs, that all that was left was a bare facial challenge. And the affidavits that those plaintiffs in that case had submitted were inadequate. The problem with Summers, if I remember it correctly, was you had an organization, but they didn't have identified members to show the member standing, right? I believe that's correct. I think they were relying on sort of a statistical probability that one of them... I just put my cards on the table. I thought the Hartman affidavit was good enough. A, it seems like that gets them over the Summers problem, and B, why isn't that good enough? So I believe the Hartman affidavit concerns the Rosemont Copper Mine project. And at the time of that affidavit in 2017, that was the summary judgment briefing that year, the project deposited waste onto what plaintiffs contended were invalid mining claims. It didn't concern mill site claims at all. Plaintiff's allegation about Rosemont, that project that's at issue in that declaration, is that since the Ninth Circuit's decision holding the authorization for that mining of that project invalid in 2022, the mining companies have switched their plan to deposit mine tailings on mill sites that they now claim. But that wasn't the case at the time of the summary judgment briefing. So those changed facts might support some future declaration if they could connect the dots sufficiently, but respectfully, the facts have changed since that declaration. I'd briefly point to the declarations concerning another project, the only other project that they invoke, the Mount Emmons mine. That has not been the subject of any authorization by the agencies since the summary judgment briefing, and it's not clear that there's any imminent harm coming to plaintiffs, particularly as a result of anything related to the regulation they're challenging about mill sites. So moving to the discussion of the merits a bit. I think I did address the logical outgrowth argument briefly related to the comments. I'll just focus right now on the mining law question. It's our submission that the plaintiff's reading of the statute is not compelled by the statute's text or its history. And so, therefore, their interpretation is at best one of a number of reasonable interpretations, if you could give them the benefit of the doubt that it's reasonable. And so it's nothing that's compelled under the precedent to be substituted for the agency's judgment here. They point primarily to... Suppose, before we decide this case, the Supreme Court were to overrule Chevron and tell us to just decide what we think is the best reading of the statute. What's your position about the best reading of this statute? We've made text-based arguments here, and the court can decide under step one in our favor, but we're advocating... Well, it's not step one, right? Right. It's just lack of ambiguity. I'm just saying, what is the best reading? So we don't have... I mean, the agencies do not have a position on what the better reading of the statute is. They've, you know, if they were writing on a blank slate, you know, they might do things differently. But, you know, their view is that this is a regulation that has sufficient ambiguity to allow them to interpret it. You want to be able to defend it if the agency flip-flops. That's the best you're going to tell us. Either reading is okay. That's a fair observation. I mean, the agency is interested in preserving discretion. As you know... Tell me why you're... Tell us why yours is as good as you think it is, whether it's unambiguously compelled the best reading or a reasonable reading. So the statute does not expressly limit the number of misogynistic claim it can obtain. By contrast, it limits the size of the mill sites. Likewise, for mining claims, both for load claims in Section 23 and for plastic claims in Section 35, the size of those claims is limited, but not the number. Why would you limit... Why would... Why might a rational Congress want to limit the size, but not the number? If it's just a matter of they can get as much as they want, but if they want 100 acres, they have to file 20 claims rather than just one. What's the sense of that? So the best support for that that I can find in the text is the limitation for the user occupancy. And that that is a meaningful limit, although it's not a numeric limit on the mill site claims. So for each five acre parcel, the claimant has to make in its patent application, just to put context here, this is related to when somebody is submitting a patent application for actual ownership of the mill sites. They'd have to provide sufficient evidence demonstrating that they're used or occupied for mining or milling purposes. Why have a five acre limit? Why can't it be just as much as they want to use for mining or milling purposes? Why have a five acre limit? Well, that just shows that they have to demonstrate on a five acre by five acre basis that each of those... Why? Why would you have that if it's just as long as you're going to use it for mining or milling purposes? Well, I can't... I don't know. I mean, I don't think we have to define an actual purpose that the Congress in 1872 had in mind. But I, you know, from what I can hear... Do you think that Congress in 1872 intended that there could be unlimited land use for mill sites? Unlimited land use? I mean, it didn't cap the acreage, but I think they did intend... I mean, from the text, there is a meaningful requirement that there's actual use or occupancy. So it's not as if they can... I'm just asking, do you think that the Congress in 1872 intended that you could have multiple mill sites, as many as you want, as long as you're using them for milling and mining purposes? Yes, I do believe that's the case. And I think... What's your evidence for that, that that was their intention? Well, if you look at the statutory history, the 1866 load law did... And this is not related to the mill sites, but it's related to load mining claims. It did include a numeric limit on load mining claims that could be subject to a patent, and that statute was repealed. No, I understand that. I'm just trying to understand why you think that the 1872 Congress intended to allow unlimited numbers of mill sites. Well, I don't think there's unequivocal intent evidence either way. I mean, that's our argument for why it's ambiguous, but the best argument that I can... I think structurally, though, it seems that, as we've discussed, I think there is some textual reading you could read such to indicate they meant all of the mill site land is limited to five acres. They've linked the mining, the mill sites to a mining claim. The claim is limited in size. They've got this five acre limit for the mill site. It would be odd that there's a limit on size for the mining claim, but no limit on the amount of land you could use for mill sites. So just structurally, it seems to weigh in favor of the other reading. You've got contemporaneous interpretations. The J.B. Hagen case and the heckler of consolidated mining were as contemporaneous as we have, suggest there is a five acre limit. And that's just from back then. Then we have Congress, to the extent we want to look at what they think in more modern times, but they amended the statute to deal with placer claims. They stated that their understanding was the statute, as it originally was, was five acres per mining claim. Then after the 1997 opinion came out, which took the position that Earthworks is advocating, Congress didn't reject that or say that was wrong. They just put it off. There just seems to be a lot of evidence on the side of the scale weighing in favor of the interpretation, the five acres per mining claim interpretation. In my mind, it's really just is it unambiguously so or not, but it just seems there's a lot of evidence on the other side. And on your side of the scale, you're saying, well, this is the way the Bureau of Land Management has been doing it. But just because they've been doing it that way doesn't mean it was a correct interpretation of the statute. And then there's all these expert entities, too. They're all cited in the 1997 opinion. They all assumed it was a five acre per mining claim limit. And then there's the Public Land Law Review Commission, the Office of Technology Assessment Review. It's just everybody seems to believe, or many sources seem to believe, legally speaking, it's supposed to be this five acre limit. And what you're really relying on is just agency practice, which doesn't really speak to whether it's the correct interpretation. Of the statute. In my mind, it's just whether this is unambiguous or not. A few points. Well, our contention is that it is ambiguous, but a few points in response to the various evidence that you're talking about. You know, I think the best analysis of all of this is the 2003 sole service opinion. And I think it treats this in detail. But, you know, this is not an issue that would have come to the fore of the general land office, which is BLM's predecessor's attention in the early years, except when someone was applying for a patent. This kind of gets back to our standing argument, which is that this statute concerns patenting, concerns locating and staking claims and patenting it for property rights. So it's not going to be that miners whose state claims are going, at that historical time, were going to the general land office to record those claims. They were recording them under the or staking them under the laws and regulations of local mining districts. And to the extent states regulated them under those laws and regulations. But they weren't going to the general land office to where there was there was a need to resolve that issues, which may explain the absence from the historical record of resolution of the dispute early on. But I would I would also point the court to. Just on that point, the nuts and bolts of how this works. It seems pretty clear that. With regard to mining, the mining sites, the statute contemplates claiming and patenting. And companies often can claim and extract the minerals without getting any patent, correct? Yes. OK, does that same division apply with respect to mill sites? Because I did notice this odd feature of Section 42, which is on its face, it seems to be just about patenting the mill site claim. It sort of seems to assume that there's the antecedent practice of the informal claiming, which is self executing. And you can claim the site. You don't have to go to the government. Is that how it actually worked with respect to the mill sites as well? That's my understanding. I mean, I can I don't have another statute to point to that has requirements for locating and staking claims for mill sites. There's a statute, Section 28, that concerns mining claims, low references, regulations of local mining districts. And that was really the way that this evolved was that in the West, there were local mining districts that sort of govern the the miners themselves. And so it's largely a self-regulated industry in its early years. And Congress adopted that framework in deferring to those local regulations and later state regulations of how to state those claims. So there's not a federal statute. OK, thanks. I'm sorry, Judge Payne. Go ahead. Oh, I was going to note you were saying that maybe didn't come up because, you know, when people came in to, I guess, try to patent their mill sites. But there's that case where they happened to want to claim two mill sites, but they were 4.5 acres and 0.5 acres, like making sure that they didn't exceed the five acre limit, which one could infer means that everybody understood you can move over five acres. I understand that's one reading of it. I mean, because it wasn't over five acres, the issue wasn't necessarily necessarily the decision. But a counterexample would be the Gould and Curry mining claims, also known as the Comstock load that's discussed in our red brief at page 44. And in the 2003 solicitor's opinion, the Joint Appendix 756, there the acreage of mill sites far exceeded the length of the load claims, if you look at the ratios. So, you know, it's not it's not clear from the historical record. I'm sorry, would that be upheld by a court somehow or why is that relevant? No, it's just it's not to my, I apologize. I don't know all the details, but it's not part of a court decision, but it is part of the historical record that is part of the basis for the decision makers adoption of the rule. So does that just support the notion that it has been the practice of the BLM to approve these things, even if they exceeded the five acre limit? I mean, that may be, but this was from this is a contemporaneous example from around the time of the mining laws enactment in the 1870s. So it would have been BLM's predecessor, but I mean, I take your point that there's not a judicial decision that definitively resolves this. I sort of, regarding the another argument that my friend on the other side presents, he relies heavily on this narrowing canon of construction for land grants. And, you know, I want to just briefly point out that this is countered by the 2003 opinion at page 752 of the Joint Appendix, page 13 of the opinion, a citation to the Supreme Court's decision in Leo Cheap. It involved a railroad statute, Union Pacific Act, that was that that canon that he's talking about narrowing was not applied to. And the mining law better resembles the statute in that case, because it was held that statutes that are not outright grants like this mining law, but rather provide a framework for someone to obtain a benefit by investing time and work and resources. That that narrowing canon doesn't apply to those types of statutes. And the solicitor's opinion in 2003 distinguished that narrowing canon on that basis. I see I'm well over my time. I'm happy to continue addressing the court's questions. Judge Pan, anything else? No, thank you. Judge Ginsburg, no? No, thank you. Okay, we understand your position and thank you for your argument. Next up is the intervener, Ms. Dawson. Good morning, Your Honors, and may it please the court. Elizabeth Dawson appearing on behalf of the Mining Intervenor Appellees. The Mining Law of 1872, or as it was originally titled, an act to promote the development of mining resources of the United States, has one paramount objective, to make federal public land free and open for exploration and recovery of the nation's mineral resources. That objective is as important today with the nation on the precipice of another technological revolution as it was in 1872. Now, we agree with the United States that the 2003 Mill Site Rule faithfully effectuates the Mining Law. However, we submit that the Mining Law is not ambiguous, but rather that by looking at those traditional tools of statutory construction, text, context, purpose, and history, the court can and should readily determine that the Mining Law's mill site provision does not restrict the number of five-acre mill site claimants they locate as long as they are reasonably necessary to effectively exercise the statutory right to mine. And to that point, I would like to briefly respond, Judge Pan, to your question about the use of the word such, because I think it's also important that the statute includes the word location. That word location is repeated both in the load claim and the placer claim statutory language. So, whereas there is an acreage limit in all three cases, load, placer, and mill site, there is not a location restriction. And this makes sense that Congress wanted to encourage the development of mineral resources and prescribed a specific acreage as a default, but did not limit the number of locations that may be staked, as long as they comply with the other rules, which are restrictions on the staking of mill sites. As Judge Cassius, you said, must be non-contiguous to the banner load. They must be non-mineral in character. They must be used or occupied for mining and milling purposes. And the 2003 mill site rule imposes a further condition, which is that there be no more land than is reasonably necessary for compact mining operations. So, it is not the case that there would be unfettered use of federal land for milling. So, in your view, what's the purpose of the five-acre wording in the statute? I think it's important to look at the five-acre in contrast with the 20-acre default for mining claims. So, the mining law, understandably, is focused on mineralized land. And so, mineralized land can be staked 20 acres at a time. For non-mineralized land, we agree with our opponents that there are other uses that such land can be put to. So, it makes sense that there would be a smaller default acreage for the mill site. But that was not to say that there could be only one mill site per mining claim. And I think the further… But what is that limit doing? Sorry, I didn't hear an answer. Oh, I'm sorry. It's because it has to be non-mineralized land. It makes sense that that is a smaller default because that land could be put to other uses. And Congress wanted to put the burden on claimants to show that it was being used or occupied for mining or milling purposes. But if the purpose is for the mill site land to be smaller than the mining claim, your interpretation allows the mill site land to dwarf the mining claim. You can have as many mill sites as you want. You can have infinity mill site land. Well, Your Honor, I do believe that the non-mineralization requirement, user occupancy, and non-contiguous do impose important restrictions on the amount of land. But it can still dwarf the mining claim. That is possible. That is what is necessary to engage in the mining as approved by the Interior Department with all the other restrictions. But you said the default reflects a desire that the mill site be smaller than the mining claim. No, just that the claimants have to prove five acres at a time that they really need that land. Not that it be limited to five acres in total. I'm sorry. I thought when Judge Cassie asked you what work is the five acres doing, you said the default is it should be smaller than the mining claim. One quarter of the mining claim. Correct. The mining claim is default 20 acres, and the mill site claim is default five acres. There is no limit on the number. But how is that default consistent with your general view that the mill site can be infinity and the mining claim is always limited to 20? Your Honor, I don't maintain that the mill site could be infinity because of these other restrictions. Right, but I don't think that it's a very big restriction to say you have to use this for mining purposes. It can be a very large number. This ratio could be 100 to 1 mill site to mine claim. It could be 1,000 to 1 as long as you're using it for milling and mining purposes. We do believe that that is the correct reading of the statutory text, that it does not limit the number of mill site locations that may be located. No, I understand it just seems to be inconsistent with your explanation for why there's a five acre limit to begin with. I don't believe it's inconsistent, Your Honor, because of this requirement of mineralized land for mining claims versus non-mineralized land, which again can be put to other uses. So the burden is on the claimant to show that each five acres is necessary. Now, I think there's also, I'm sorry, I'm getting over my time. In 1872, if there was no occasion for mill sites to be multiplied and to extend over large tracts of large acreage, then isn't it likely that the Congress just never contemplated that these be multiplied to the hundreds or thousands? Your Honor, it's possible that Congress did not contemplate such a large area as eventually was needed, but as Mr. Toth pointed out. This is a point that I think supports you. Congress didn't anticipate that they didn't put a limit on it. They just had no reason to think there should be a limit. I think that's correct, Your Honor. The whole purpose of the mining law was to promote the use of federal public land to obtain mineral resources. And it was the case back then that there were large loads and there were large operations to recover those resources. Whether or not the intent was for a specific number is immaterial because the language of the statute simply does not restrict mill site claimants to one five-acre mill site. If there are no other questions, I can conclude. Judge Payne, anything else? Ginsburg? No, thank you. You want a sentence or two? We understand the conditions. I'll conclude. Thank you. So appellants aim in pursuing this case as plain. They seek to prevent mining claims from being mined. But this is an obstructionist reading of the mining law that eviscerates Congress's intent in passing it, revealing the fallacy of the argument. As such, we believe appellants' appeal should be denied and the district court's judgment affirmed. Thank you. Thank you. Mr. Flynn, we'll give you two minutes. Okay, thank you, Your Honor. First on standing, can you hear me? Yes. Okay. First on standing, the Melton Declaration for the mine outside of Crested Butte was filed when there were mill sites proposed. They're still proposed at that mine. And she specifically linked the lack of agency discretion over that mine based on the 2003 mill site rule. And so they said we didn't raise mill sites in any of our declarations. The Melton Declaration flat out says that. The Hartman is later, but the Melton Declaration is specifically on point. You know, the industry's argument at the end that we're making some policy argument. No, we're making an argument on the language in 1872 and the congressional intent. Also, the presumption. Now, the Department of Justice referenced the Leo Sheet case. If you go to that decision, it's 99th Supreme Court at page 1411. It says the presumption in favor of limiting the grant, quote, when the act operates, it's meant manifestly clearly the intention of Congress. I think the other two attorneys on the other side basically said, well, this is ambiguous. And we have to defer to under Chevron, too. But if they say it's ambiguous. Then it's not clear. We think it's clear that they limited the amount of time. And so, therefore, they have to apply that presumption. And lastly. We didn't hear any new evidence. I think Judge Pan talked about this. We've got a few decades of field offices in Nevada and Idaho saying you get as much as you need, as much as you want. And you do. That's not in the law. I think history matters here, your honors. And I think we have to look at the going to Judge Ginsburg. Congress did not contemplate doing this. The agency just can't manufacture a congressional intent that did not exist in 1872. And we think based on the law, we respectfully ask the court to reverse the district court decision. At a minimum, do a rulemaking complies with APA and NEPA. And, of course, with instructions on the proper interpretation of 1872 as if this was the Supreme Court in 1872. So thank you for the extra time, your honor. Thank you, counsel. Very much. Judge Pan, anything else? No. Judge Ginsburg. No, thank you. Okay. Thanks, Mr. Flint. The case is submitted.
judges: Katsas, Pan, Ginsburg